**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| ROBERT SUTTON, | ) | CASE NO. 1:17CV233 |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES S. GWIN |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | JONATHAN D. GREENBERG |
| NANCY A. BERRYHILL, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION** |

Plaintiff, Robert Sutton ("Plaintiff" or " Sutton"), challenges the final decision of

Defendant, Nancy A. Berryhill,[1] Acting Commissioner of Social Security ("Commissioner"),

denying his applications for Period of Disability ("POD"), Disability Insurance Benefits

("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social

Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act"). This Court has jurisdiction pursuant

to 42 U.S.C. § 405(g). This case is before the undersigned United States Magistrate Judge

pursuant to an automatic referral under Local Rule 72.2(b) for a Report and Recommendation.

For the reasons set forth below, the Magistrate Judge recommends that the Commissioner's final

decision be VACATED and the case REMANDED for further proceedings consistent with this

---

[1] On January 23, 2017, Nancy A. Berryhill became the Acting Commissioner of Social
Security.

1

decision.

# I. PROCEDURAL HISTORY

In December 2012, Sutton filed applications for POD, DIB, and SSI, alleging a disability onset date of July 13, 2012 and claiming he was disabled due to diabetes, right foot toe amputations, and poor vision. (Transcript ("Tr.") 12, 247.) The applications were denied initially and upon reconsideration, and Sutton requested a hearing before an administrative law judge ("ALJ"). (Tr. 141, 155, 167.)

On June 10, 2015, an ALJ held a hearing, during which Sutton, represented by counsel, and an impartial vocational expert ("VE") testified. (Tr. 29-63.) On September 25, 2015, the ALJ issued a written decision finding Sutton was not disabled. (Tr. 12-28.) The ALJ's decision became final on December 7, 2016, when the Appeals Council declined further review. (Tr. 1-4.)

On February 5, 2017, Sutton filed his Complaint to challenge the Commissioner's final decision. (Doc. No. 1.) The parties have completed briefing in this case. (Doc. Nos. 12 & 13.) Sutton asserts the following assignments of error:

(1) The ALJ failed to provide adequate analysis of Sutton's impairments under Listing Sections 1.02, 1.05, 9.00, and 11.14.

(2) The ALJ erred at Step Five[2] of the sequential evaluation, in concluding Sutton is capable of a light work. This finding is in error because the ALJ did not properly consider the opinion of Sutton's treating physician, failed to perform an acceptable credibility evaluation, and failed to consider the claimant's need for a cane and well-established upper extremity limitations.

(Doc. No. 12.)

---

[2]    The Court notes the determination of the residual functional capacity is actually determined prior to step four of the sequential evaluation, not step five, as the Plaintiff suggests. *See* 20 C.F.R. §§ 404.1520(a)(4)(iv) and 416.920(a)(4)(iv).

## II. EVIDENCE

**A.      Personal and Vocational Evidence**

Sutton was born in June 1969 and was 43 years-old at the time of the alleged onset date, and 45 years old at the time of his administrative hearing, making him a "younger" person under social security regulations. (Tr. 21.)  *See* 20 C.F.R. §§ 404.1563(c) & 416.963(c). He has a limited education and is able to communicate in English. (Tr. 21.)  He has past relevant work as a landscape laborer (D.O.T. #408.687-014), a commercial cleaner (D.O.T. #381.687-014), a warehouse-material handler (D.O.T. #929.687-030), an appliance delivery person (D.O.T. #905.687-010), and a production assembler (D.O.T. #706.684-018). (*Id.*)

**B.      Medical Evidence**

As Sutton's grounds for relief relate to his diabetes-related complications, the Court's recitation of the medical evidence will be limited to those impairments, with particular emphasis on Sutton's complaints regarding pain, numbness, and tingling in his hands, as well as his need for a cane for ambulation.[3]

Sutton has a long, well-established history of diabetes, which has lead to several physical complications. (Tr 701.)  In August 2011, prior to the alleged onset date, he was hospitalized for diabetic ketoacidosis. (Tr. 320.)  At that time, Sutton underwent surgical incision and drainage, as well as debridement, of a diabetic foot ulcer on his right foot. (Tr. 311.)  During this procedure, surgeons removed a portion of his fifth toe on his right foot. (Tr. 701.)

---

[3]      The Court further notes that its recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' briefs.

Sutton thereafter followed up with his primary care doctor, Stephen P. Hayden, M.D., on September 21, 2011. Dr. Hayden noted Sutton had poorly controlled diabetes, and was not receiving regular care. (Tr. 387.) He encouraged Sutton to follow up with a podiatrist and endocrinologist. (*Id.*)

Sutton established at an endocrinology clinic on October 1, 2011. (Tr. 393.) His surgical wound was progressing well, and he was taking his diabetes medications. (Tr. 402.) He presented to podiatrist, Patrick McKee, DPM, on January 27, 2012. (Tr. 439.) Dr. McKee noted some of the skin had peeled off Sutton's right foot, as his shoes were not fitting properly. (*Id.*) Sutton indicated to Dr. McKee he was recently approved for a diabetic shoe, and it was coming in the next few days. (*Id.*) Sutton also had a new abrasion on his foot, but his partial fifth toe amputation had healed. (Tr. 440.)

On April 19, 2013, Sutton established with a new primary care doctor, Judith Weiss, M.D. (Tr. 542.) Dr. Weiss noted Sutton's diabetes was under poor control. (*Id.*) Sutton also had a gait disturbance, and could not feet the distal toes in either foot. (*Id.*) On examination, Sutton had a skin graft where his amputation had occurred. (Tr. 544.) Both of his feet had callus at the first metatarsal head plantar surface. (*Id.*) He had normal pulses bilaterally in both feet, but reduced sensation in both great toes, the 2nd toes, and the first metatarsal head. (*Id.*) Dr. Weiss told Sutton he needed to wear diabetic shoes, and referred him to a podiatrist. (Tr. 545.)

On August 22, 2013, Sutton had an x-ray of his right foot. (Tr. 683.) Beyond his amputation, there were some degenerative changes in the remaining toes and midfoot, and some soft tissue swelling in the forefoot. (*Id.*)

Sutton then established with neurologist Marc Winkelman, M.D., on October 10, 2013.

(Tr. 674.)  Sutton indicated he had felt off balance since his 2011 amputation, and his feet were numb. (*Id.*)  He further indicated his hands felt "ok."  (*Id.*)  On examination, Sutton had good motor tone, but decreased strength in his lower extremities. (Tr. 677.)  His sensation was reduced below his knees, and his vibratory sensation was reduced in his fingers and toes. (*Id.*)  His coordination was satisfactory, but his gait was wide-based and he was unable to tandem walk. (*Id.*)  Dr. Winkelman felt these findings were consistent with chronic sensorimotor polyneuropathy and sensory ataxia. (*Id.*)  He ordered an EMG and some labwork. (*Id.*)

A November 5, 2013 EMG of Sutton's right arm and right leg revealed peripheral sensorimotor polyneuropathy, severe in degree, with evidence of ongoing or recent denervation. (Tr. 664.)  The findings were suggestive of right S1 and S2 radiculopathy. (*Id.*)  The interpreting physician noted the EMG could not distinguish between 'garden variety' radiculopathy and diabetic polyradiculopathy. (*Id.*)

Sutton returned to Dr. Winkelman's office on November 19, 2013. (Tr. 650.)  He indicated he recently felt off balance while carrying furniture. (*Id.*)  He also relayed that two of his fingers on each hand had been feeling tingly for the past two weeks. (*Id.*)  On examination, Sutton again had a wide-based gait, and could not tandem walk. (Tr. 628.)  Dr. Winkelman reviewed the EMG, noting it revealed severe axonal peripheral neuropathy and a possible right S1 root lesion. (*Id.*)  The doctor then ordered a lumbar MRI and a course of physical therapy. (*Id.*)

Sutton followed up with Dr. Weiss on December 5, 2013. (Tr. 639.)  Dr. Weiss noted Sutton had neuropathy, as well as some pain with ambulation. (Tr. 640.)  Right knee x-rays revealed a moderate degree of degenerative arthropathy and small volume knee joint effusion.

(Tr. 649.)  There was no acute osseous or articular abnormality. (*Id.*)

On January 30, 2014, Sutton had his first visit at the Department of Physical Medicine and Rehabilitation at MetroHealth. (Tr. 681.)  He indicated numbness and tingling in the last two fingers of each hand for the past six months. (*Id.*). He also described intermittent pain in his hands. (*Id.*)  As for his feet, Sutton reported numbness in both feet, poor balance, and stumbling. (*Id.*)  He denied any falls. (*Id.*)  He also denied use of a cane or walker. (*Id.*)

On examination, Sutton had negative Tinel's signs at his wrists and elbows. (Tr. 685.) His back range of motion was mildly decreased, with no trigger points or tenderness. (*Id.*)  His straight leg raises were negative bilaterally. (*Id.*)  Sutton had reduced sensation below his knees, in his toes, and his fingers; normal motor strength in his arms and legs; and normal fine motor coordination. (*Id.*)  He had difficulty walking in a straight line, and difficulty with a single leg stance. (*Id.*)  The examining doctor, Antwon Morton, D.O., referred him for physical therapy. (Tr. 686.)

Sutton returned to Dr. Winkelman's office on February 3, 2014. (Tr. 691.)  He indicated no change in his balance and feet, and again relayed that his 4th and 5th fingers were numb bilaterally. (*Id.*)  On examination, Sutton had decreased 4/5 strength in his upper extremities, and reduced sensation in the 4th and 5th fingers of each hand. (Tr. 693.)  His gait was "ok." (*Id.*)

Dr. Winkelman felt this examination was suggestive of bilateral ulnar mononeuropathy, in addition to polyneuropathy. (*Id.*)  He ordered an EMG of both arms, a lumbar MRI, and encouraged Sutton to begin physical therapy. (*Id.*)  A February 3, 2014 lumbar MRI revealed moderate facet arthropathy, with a disc protrusion at L4-5 and L5-S1. (Tr. 698.)  There was no significant nerve compression. (*Id.*)  An EMG of Sutton's right arm revealed peripheral

sensorimotor polyneuropathy, and possible mild cervical radiculopathy. (Tr. 807.)  There was no clear cut evidence of superimposed right cervical radiculopathy. (*Id*.)

Sutton began a course of physical therapy on February 5, 2014. (Tr. 701.)  He denied use of an assistive device to ambulate. (*Id*.)  On examination, Sutton had decreased sensation in his feet and lower legs, from midway on his shin to his toes. (Tr. 703.)  He also had a chronic, slow-healing ulcer on his right foot. (*Id*.)  Sutton admitted he had not been wearing his diabetic shoes, because they had worn down. (*Id*.)  He had decreased strength in both legs, with an antalgic gait. (Tr. 704, 705.)  The physical therapist, Maureen Farrell, PT, noted he was occasionally unsteady, and issued him a cane for ambulation. (Tr. 705.)

Sutton attended physical therapy for several weeks. (Tr. 711, 724, 751.)  He had improved steadiness and reduced deficits with his cane. (Tr. 724.)

On February 24, 2014, Sutton visited the diabetic foot clinic at MetroHealth. (Tr. 774.) The treating nurse practitioner, Denise Forster-Paulsen, C.N.P., noted his skin graft from 2011 had "come off" in June 2013. (*Id*.)  Sutton had a large amount of callus on his right 4th toe, so the nurse practitioner debrided this area. (Tr. 776.)  Ms. Forster-Paulsen encouraged Sutton to wear diabetic shoes, and to stay off of his feet until this area healed. (Tr. 776, 779.)  As a result, Sutton had to discontinue physical therapy. (Tr. 794.)  X-rays indicated no osteomyelitis in his right foot. (Tr. 803.)

Sutton returned to the  Department of Physical Medicine and Rehabilitation at MetroHealth on March 31, 2014. (Tr. 832.)  He indicated he was still having constant numbness in the 4th and 5th fingers on each hand. (*Id*.)  He was using a cane, and denied any falls. (*Id*.)  On examination, Sutton had decreased sensation in his feet and fingers. (Tr. 837.)  His motor

strength was normal, and his fine motor coordination was also normal. (*Id*.)  He had difficulty walking in a straight line. (*Id*.)

Sutton visited Dr. Weiss on April 2, 2014. (Tr. 842). Dr. Weiss noted his diabetes was under much better control. (*Id*.)  Sutton's muscular strength was intact, but he was unable to stand with eyes closed without falling backwards. (Tr. 845.)  Sutton saw Dr. Winkelman on April 11, 2014. (Tr. 857.)  He reported intermittent sharp pains in his hands, so Dr. Winkelman ordered an EMG of the left arm. (Tr. 857, 858.)  The May 19, 2014 EMG revealed left ulnar mononeuropathy, and superimposed peripheral neuropathy. (Tr. 899.)

On May 9, 2014, Sutton visited Dr. Winkelman's office in order to have a form filled out regarding his condition. (Tr. 887.)  Dr. Winkelman had a 15-minute conversation with Sutton before filling out the form. (*Id*.)  Following this visit, Dr. Winkelman filled out a form prepared by Sutton's counsel, which offered the following limitations/observations:

- Sutton has polyneuropathy and ulnar mononeuropathy, which is constant, in both hands, and severe;

- He can walk less than one city block, sit for 15 minutes at a time, and stand for 5 minutes at a time;

- He can stand/walk for less than 2 hours total, and sit for about 4 hours total in an 8-hour workday;

- He would need a job that permits shifting positions at will;

- He will need to have periods of walking around during the workday;

- He will need to walk around every 15 minutes, for 3 minutes at a time;

- He will need to take 2-3 unscheduled breaks a day, lasting 20-30 minutes;

- He needs to use an assistive device, but does not need to elevate legs with prolonged sitting;

- He can rarely lift less than 10 pounds, and cannot lift any more than 10 pounds;

- He can rarely twist, climb stairs, climb ladders, and never stoop or squat;

- He has significant limits in reaching, handling, and fingering, noting "his hands are weak and numb and for those reasons they lack dexterity and strength;"

- He will be off task more than 25% of the workday, is capable of moderate stress, and would likely miss work more than 4 days a month due to his impairment.

(Tr. 883-886.)

Sutton also visited the diabetic foot clinic several times during May 2014. (Tr. 867, 939.) He continued to ambulate on his feet, and, therefore, his ulcer did not improve, resulting in additional debridement. (Tr. 869, 939.) On May 22, 2014, he had developed a new ulcer. (Tr. 939.) He indicated this was likely due to wearing his diabetic shoes too tight. (*Id*.) The nurse practitioner at the clinic, Ms. Forster-Paulsen, dressed both wounds, and again told him to stay off his feet. (*Id*.) Both of his ulcers had healed by June 12, 2014. (Tr. 959.) However, he was still developing callus where the ulcers had been. (*Id*.) He was then fitted for new diabetic shoes, and indicated they were comfortable. (*Id*.)

On June 16, 2014, Sutton visited orthopedist Jonathan Streit, M.D., for his hand symptoms. (Tr. 964.) He reported numbness in his hands, but denied any weakness. (*Id*.) On examination, he had 4/5 strength in his fingers, and 5/5 strength in the remainder of his upper extremities. (Tr. 966.) He was stable with the use of a cane. (*Id.*) Bilateral x-rays of the hands demonstrated no abnormality. (*Id.*) Dr. Streit scheduled Sutton for a left ulnar nerve

decompression, with a possible right ulnar nerve decompression in the future. (*Id.*)

Sutton returned to Dr. Winkelman's office on June 20, 2014. (Tr. 973.) He had a wide-based gait and was unable to tandem walk. (Tr. 975.) Dr. Winkelman agreed Sutton needed bilateral ulnar surgery. (*Id.*) Sutton underwent a left ulnar nerve decompression in September 2014. (Tr. 1069.) Post-operatively, Sutton did well. (*Id.*) On September 15, 2014, his ulnar nerve parethesias was improving. (*Id.*)

On September 25, 2014, Sutton visited Dr. Weiss, reporting bilateral knee pain with some gait issues. (Tr. 1049.) Updated x-rays revealed bilateral patellofemoral osteoarthritis changes, but otherwise, the joint spaces were maintained. (Tr. 1067.) There was no large effusion. (*Id.*) Sutton resumed physical therapy shortly after. (Tr. 1014.) During his initial therapy session, Sutton had an antalgic, slow gait, but was independent with his cane. (Tr. 1015.) He relayed he was using the cane to ambulate for both community and household distances. (Tr. 1029.)

Sutton's right foot ulcer recurred in October 2014. (Tr. 1041.) He visited the diabetic foot clinic on October 15, 2014 to have this ulcer debrided and his dressings changed. (*Id.*) He was wearing his diabetic shoes with inserts. (*Id.*) Sutton returned on December 3, 2014, and admitted he had been ambulating more than normal. (Tr. 1166.) He continued to have an ulcer on his 4th toe on his right foot, but there were no signs of infection. (Tr. 1169.)

Sutton followed up at the diabetic foot clinic in January and February 2015. (Tr. 1153, 1144.) He continued to have an ulcer on his right foot, but he also continued to ambulate on this foot. (*Id.*) On March 18, 2015, Dr. Weiss noted Sutton's ulcer had developed some necrotic black tissue, which needed aggressive debridement. (Tr. 1124.) Sutton visited the diabetic foot clinic the next day for treatment. (Tr. 1114.) The wound had become larger, and required

evaluation for osteomyelitis. (*Id.*)

Sutton subsequently was hospitalized from March 24 through March 30, 2015 for fourth metatarsal osteomyelitis. (Tr. 1303, 1304.) On March 28, 2015, he underwent a right transmetatarsal amputation and tendo-Achilles lengthening. (Tr. 1227.) Upon follow-up on April 7, 2015, he indicated he was doing well, and his pain was well-controlled. (*Id.*) He was keeping his leg elevated as instructed. (*Id.*)

Sutton then had multiple post-op visits to monitor the healing of his amputation site. (Tr. 1235, 1247.) On April 21, 2015, he had three areas of dehiscence on his foot. (Tr. 1236.) Due to his slow healing course, Sutton underwent a wound closure and implantation of osteoset vanco impregnated beads on May 8, 2015. (Tr. 1253.) On May 14, 2015, he indicated he was doing well, and his podiatrist, Stella Chlunda, DPM, also noted he was progressing well. (Tr. 1253, 1254.)

His right foot amputation site continued to close up and heal. (Tr. 1259, 1264.) His doctor ordered him new diabetic shoes on May 20, 2015. (Tr. 1265.) On May 28, 2015, he indicated he was still doing well and currently using crutches. (Tr. 1270.)

On May 29, 2015, Sutton returned to Dr. Winkelman's office. (Tr. 1352.) He indicated he had undergone his left ulnar operation, but had not undergone it for his right side. (*Id.*) He reported his right arm symptoms were unchanged, as were his left. (*Id.*) He also indicated his left foot felt the same, and informed Dr. Winkelman about his recent right toe amputation. (*Id.*) On examination, his muscle tone was "ok" and his sensation below his knees and in his 4th and 5th fingers on each hand continued to be reduced. (Tr. 1353.) He was ambulating with a cane. (*Id.*) Dr. Winkleman assessed both Sutton's diabetic polyneuropathy and bilateral ulnar

neuropathy to be stable, and referred him to an orthopedist to have a consultation for a right sided ulnar nerve decompression. (Tr. 1354.)

Sutton returned to physical therapy in June 2015 for bilateral knee pain. (Tr. 1354.)  He had decreased balance and a disturbed gait during sessions. (Tr. 1350.)  He did not report any changes or improvements from therapy after a few visits. (Tr. 1341.)

In addition to his hand and feet issues, Sutton developed visual issues due to his diabetes. Sutton visited the Retina Associates of Cleveland in March 2012. (Tr. 488.)  The physician, Llewelyn Rao, M.D., diagnosed him with diabetic macular edema in both eyes. (*Id*.)  Dr. Rao filled out a form for Sutton, indicating a best corrected vision of 20/40 on the right and 20/30 on the left. (Tr. 474.)

On July 12, 2012, Sutton visited the Cleveland Eye and Laser Surgery Center, and underwent a procedure for proliferative diabetic retinopathy, with a retinal detachment in the right eye. (Tr. 483.)  Sutton thereafter underwent a visual consultative examination with Stuart Terman, M.D., on August 8, 2013. (Tr. 596.)  Dr. Terman found Sutton had proliferative diabetic retinopathy and macular deterioration in both eyes. (*Id*.)  Dr. Terman opined Sutton was able to read larger print, but would have difficulty with street signs. (*Id.*). He further opined Sutton needed to exercise great caution or avoid work at heights, and should avoid hazardous situations. (*Id*.)

Sutton also visited Sunil Srivastava, M.D., an ophthalmologist, on November 13, 2013. (Tr. 658.)  Dr. Srivastava noted he had developed early cataracts, and probable macular ischemia. (Tr. 659.)  The doctor told Sutton they would simply observe these conditions for now. (*Id*.)  Vision testing indicated Sutton had best corrected vision of 20/100 on the right, and 20/60

on the left. (Tr. 660.)

## C.    State Agency Reports

On August 22, 2013, state agency physician Paul Morton, M.D., reviewed Sutton's records and completed a physical residual functional capacity ("RFC") assessment. Dr. Morton determined Sutton could occasionally lift and carry 20 pounds and frequently lift and carry 10 pounds; stand and/or walk for a total of 2 hours in an 8-hour workday; and sit for a total of 6 hours in an 8-hour workday. (Tr. 90.)  He further found Sutton had an unlimited capacity to push and/or pull, other than shown for lifting and carrying. (*Id*.)  Dr. Morton opined Sutton could occasionally climb ramps and stairs, never climb ladders, ropes, or scaffolds, and occasionally balance, stoop, kneel, crouch, and crawl. (Tr. 90-91.)  Dr. Morton found no manipulative limitations, but did find visual limits. He determined Sutton could read ordinary print but would not be able to read some fine print; and was restricted from hazardous environments but would be able to navigate the hazards of the ordinary workplace. (Tr. 91.)  Dr. Morton concluded Sutton should avoid hazardous heights and machinery, due to visual impairment, and was restricted from commercial driving. (Tr. 92.)

On March 1, 2014, state agency physician Jan Gorniak, D.O, reviewed Sutton's records and completed a Physical RFC assessment. (Tr. 111 - 124.)  Dr. Gorniak affirmed the findings of Dr. Morton. (*Id*.)

## D.    Hearing Testimony

During the June 6, 2015 hearing, Sutton testified to the following:

- He attended high school through the 11th grade, and did not obtain a GED. (Tr. 34.)  He does not drive, but is able to use public transportation. (Tr. 44.)  He lives on his own in an apartment. (Tr. 50.)  He can prepare light meals, and perform his own bathing, dressing, and feeding. (Tr. 51.)  His sister and mother

13

assist him with grocery shopping and housework. (*Id.*)

- He recently had a toe amputated from his right foot, and now no longer has any toes on his right foot. (Tr. 44.) He indicated he does not drive due to issues with his right foot. (Tr. 44.) He has been ambulating with a cane since 2012 due to balance issues. (Tr. 42.) He can stand for 30-35 minutes total in an 8-hour workday, at the most, with his cane. He cannot stand for six hours in an eight-hour workday with his cane. (Tr. 45.) His ability to stand and walk has worsened since his recent amputation. (*Id.*) He had been fitted for a special kind of shoe for ambulation, but had not received it yet. (Tr. 54.)

- Sitting is also an issue for him. He stated his knees hurt when he sits for longer than 15 minutes at a time. (Tr. 46.) He is most comfortable sitting with his legs elevated. (*Id.*)

- Sutton has issues with his hands. (*Id.*) He stated he has cramping, numbness, and pain in both his hands. (Tr. 47.) He has trouble picking up small objects and zipping clothing. (*Id.*) He indicated he could not perform the handling required of him for delivery work or landscaping work. (Tr. 48.)

- In addition to his right foot issues, he also has numbness in his left foot, and cannot feel his left foot at all. (Tr. 50.)

The VE testified Sutton had past work as a landscape laborer (D.O.T. #408.687-014), a commercial cleaner (D.O.T. #381.687-014), an appliance delivery person (D.O.T. #905.687-010), a material handler (D.O.T. #929.687-030), and a production assembler (D.O.T. #706.684-018). (Tr. 56.) The ALJ then posed the following hypothetical question:

If you would first consider a person of the claimant's age, education, and past relevant work experience with a capacity for light walk – I'm sorry – light work[4], limited standing

---

[4] "Light work" is defined as follows: "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to substantially all of these activities." 20 CFR § 404.1567(b). Social Security Ruling 83-10 clarifies that "since frequent lifting or carrying requires being on one's feet up to two-thirds of a workday, the full range of light

and walking to two hours of eight, sitting six hours of eight, who could occasionally climb ramps and stairs, never climb ladders, ropes, or scaffolds, occasionally balance, stoop, kneel, crouch, and crawl. With the ability to read ordinary print but not fine print. The capacity to navigate the hazards of an ordinary workplace, but who would have to avoid all exposure to hazards defined as industrial machinery, unprotected heights, commercial driving. (Tr. 57.)

The VE testified the hypothetical individual would not be able to perform any of Sutton's past work, but would be able to perform other representative jobs in the economy, such as 1) assembler of small products (D.O.T. #.739.687-030), which is light, unskilled, and 217,000 positions nationally, 10,000 in the state of Ohio, and 3,500 in Northeast Ohio; 2) electronics worker (D.O.T. #726.687-010), which is light, unskilled, and 240,000 positions nationally, 13,000 in the state of Ohio, and 4,000 in Northeast Ohio; and 3) paint spray inspector (D.O.T. #741.687-010), which is light, unskilled, and 118,000 positions nationally, 6,000 in the state of Ohio, and 2,500 in Northeast Ohio. (Tr. 57-58.)

The ALJ posed an additional question to the VE, asking if the additional limitation of requiring a cane for ambulation would change the testimony. (Tr. 58.) The VE responded that with this additional limitation, the hypothetical individual would not be able to perform the occupation of paint spray inspector. (*Id.*) However, the VE further testified this hypothetical individual would be able to perform the occupation of assembler of small accessories (D.O.T. #729.687-010), which is light, unskilled, with 244,000 positions nationally, 9,000 in the state of Ohio, and 3,500 in Northeast Ohio. (*Id.*) The VE also noted that the three jobs provided (i.e., assembler of small accessories, assembler of small products, and an electronics worker) were all performed at a stationary workstation, where no essential functions were performed while

work requires standing or walking, off or on, for a total of approximately six hours in an 8-hour workday." SSR 83-10, 1983 WL 31251 (1983).

ambulating, so a cane would not be an issue. (*Id.*)

Sutton's counsel then questioned the VE regarding these occupations and the numbers provided. (Tr. 59.) Counsel asked the VE if the additional limitation of a cane would reduce the number of jobs available in the economy. (*Id.*) The VE responded it would not, again emphasizing that since the essential functions of these jobs provided did not require ambulation, a cane would not reduce the number of jobs available. (*Id.*)

Sutton's counsel then provided an additional hypothetical individual to the VE:

My hypothetical to you is an individual of the same age, education, and past work as the claimant who's limited to sedentary work[5] and requires a cane for the use of – or for – the use of a cane for ambulation. The hypothetical individual must avoid climbing ladders, ropes, or scaffolds, he can occasionally climb ramps or stairs. No crouching, crawling, kneeling, stooping, squatting, or balancing. No foot controls, no driving. The hypothetical individual must further avoid any and all workplace hazards, including unprotected heights, moving machinery, or vibration. He's further limited to jobs that don't require visual acuity, depth perception, or peripheral vision. And he can occasionally finger, feel, and handle.

(Tr. 59-60.)

The VE responded, noting that if an individual was limited to occasionally fingering, feeling, and handling bilaterally, they would be limited to one job, a call out operator. However,

---

[5]    "Sedentary work" is defined as follows: "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met." 20 CFR § 404.1567(a). SSR 83–10 provides that "Since being on one's feet is required "occasionally" at the sedentary level of exertion, periods of standing or walking should generally total no more than about 2 hours of an 8–hour workday, and sitting should generally total approximately 6 hours of an 8–hour workday." SSR 83–10, 1983 WL 31251 (1983).

the VE further clarified the call out operator position requires frequent near visual acuity, so there would be no work under counsel's hypothetical. (Tr. 60.)

### III. STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315 and 404.1505(a).1

A claimant is entitled to a POD only if: (1) he had a disability; (2) he was insured when he became disabled; and (3) he filed while he was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

A disabled claimant may also be entitled to receive SSI benefits. 20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981). To receive SSI benefits, a claimant must meet certain income and resource limitations. 20 C.F.R. §§ 416.1100 and 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4). *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that he is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. §§ 404.1520(b) *and* 416.920(b). Second, the claimant must show that he suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. §§ 404.1520(c) *and* 416.920(c). A "severe

impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education or work experience. *See* 20 C.F.R. §§ 404.1520(d) *and* 416.920(d). Fourth, if the claimant's impairment or combination of impairments does not prevent him from doing his past relevant work, the claimant is not disabled. 20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent him from doing his past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

Here, Sutton was insured on his alleged disability onset date, July 13, 2012 and remained insured through December 31, 2016, his date last insured ("DLI.") (Tr. 14.) Therefore, in order to be entitled to POD and DIB, Sutton must establish a continuous twelve month period of disability commencing between these dates. Any discontinuity in the twelve month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

### IV. SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.      The claimant meets the insured status requirements of the Social Security Act through December 31, 2016.

2.      The claimant has not engaged in substantial gainful activity since July 13, 2012, the alleged onset date (20 CFR 404.1571 *et seq*., and 416.971 *et seq*.).

3. The claimant has the following severe impairments: diabetes mellitus, amputation of the toes of the right foot; visual disturbances with diabetic retinopathy; essential hypertension; chronic anemia; chronic renal failure; peripheral vascular disease; degenerative joint disease of the knees (20 CFR 404.1520(c) and 416.920(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equal the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he can never climb ladders, ropes, or scaffolds. He can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. He has the ability to read ordinary print, but not some fine print. He can navigate the hazards of the ordinary workplace. He needs to avoid all exposure to hazards (defined as industrial machinery, unprotected heights, commercial, and driving, etc.)

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565 and 416.965).

7. The claimant was born on June **, 1969 and was 43 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563 and 416.963).

8. The claimant has a limited education and is able to communicate in English (20 CFR 404.1564 and 416.964).

9. Transferability of job skills is not an issue in this case because the claimant's past relevant work is unskilled (20 CFR 404. 1568 and 416.968).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569, 404.1569(a), 416.969, and 416.969(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from July 13, 2012, through the date of the decision (20 CFR 404.1520(g) and 416.920(g)).

(Tr. 14-22.)

# V. STANDARD OF REVIEW

"The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 2011 WL 1228165 at * 2 (6th Cir. April 1, 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-3 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999)("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.")  This is so because there is a "zone of choice" within which

the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g.,White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir.1996); accord *Shrader v. Astrue*, 2012 WL 5383120 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, 2010 WL 2837260 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

### A.      Listings

In his first assignment of error, Sutton argues the ALJ failed to properly analyze Sutton's

impairments, under Listings 1.02, 1.05, 9,00, and 11.14. (Doc. No. 12 at 8.) He asserts the analysis contained in the decision is "deficient" and "fails to include more than a very cursory analysis" of either the evidence, or the specific criteria of the Listings. (Doc. No. 12 at 8, 14.) Sutton further argues the ALJ failed to consider whether he medically equaled any Listings, noting the "decision is devoid of any meaningful analysis of these impairments singly, or in combination." (Doc. No. 12 at 9, 10.)

The Commissioner notes Sutton bears the burden of establishing an impairment that meets or equals the severity of a listed impairment. (Doc. No. 13 at 10.) She argues an ALJ is only required to address a particular listing "when the record raises a 'substantial question' as to whether the claimant meets the requirements of the listing." (Doc. No. 13 at 11). The Commissioner also argues an ALJ's discussion at other steps of the sequential evaluation may provide the necessary support for the step three conclusions. (Doc. No. 13 at 11.) Thus, the Commissioner asserts Sutton has failed to demonstrate reversible error with respect to the ALJ's discussion of the Listings. (Doc. No. 13 at 15.)

At the third step in the disability evaluation process, a claimant will be found disabled if his impairment meets or equals one of the Listing of Impairments. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii); *Turner v. Comm'r of Soc. Sec.*, 381 Fed. Appx. 488, 491 (6th Cir. 2010). The Listing of Impairments, located at Appendix 1 to Subpart P of the regulations, describes impairments the Social Security Administration considers to be "severe enough to prevent an individual from doing any gainful activity, regardless of his or her age, education, or work experience." 20 C.F.R. §§ 404.1525(a), 416.925(a). Essentially, a claimant who meets the requirements of a Listed Impairment, as well as the durational requirement, will

be deemed conclusively disabled and entitled to benefits.

Each listing specifies "the objective medical and other findings needed to satisfy the criteria of that listing." 20 C.F.R. §§ 404.1525(c)(3), 416.925(c)(3). It is the claimant's burden to bring forth evidence to establish that his impairments meet or are medically equivalent to a listed impairment. *See e.g. Lett v. Colvin*, 2015 WL 853425 at * 16 (N.D. Ohio Feb. 26, 2015). A claimant must satisfy all of the criteria to "meet" the listing. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 653 (6th Cir. 2009). "An impairment that manifests only some of those criteria, no matter how severely, does not qualify." *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990). A claimant is also disabled if her impairment is the medical equivalent of a listing, 20 C.F.R. §§ 404.1525(c)(5), 416.925(c)(5), which means it is "at least equal in severity and duration to the criteria of any listed impairment." 20 C.F.R. §§ 404.1526(a), 416.926(a).

Where the record raises a "substantial question" as to whether a claimant could qualify as disabled under a listing, an ALJ must compare the medical evidence with the requirements for listed impairments in considering whether the condition is equivalent in severity to the medical findings for any Listed Impairment. *See Reynolds v. Comm'r of Soc. Sec.*, 424 Fed. App'x 411, 414-15 (6th Cir. 2011). In order to conduct a meaningful review, the ALJ must make sufficiently clear the reasons for her decision. *Id.* at 416.

Moreover, "the ALJ's lack of adequate explanation at Step Three can constitute harmless error where the review of the decision as a whole leads to the conclusion that no reasonable fact finder, following the correct procedure, could have resolved the factual manner in another manner." *Lett,* 2015 WL 853425 at *16. *See also Ford v. Comm'r of Soc. Sec.,* 2015 WL 1119962 at *17 (E.D. Mich. March 11, 2015) (finding that "the ALJ's analysis does not need to

be extensive if the claimant fails to produce evidence that he or she meets the Listing"); *Mowry v. Comm'r of Soc. Sec.,* 2013 WL 6634300 at *8 (N.D. Ohio Dec. 17, 2013); *Hufstetler v. Comm'r of Soc. Sec.,* 2011 WL 2461339 at *10 (N.D. Ohio June 17, 2011).

Here, the ALJ provided the following discussion at step three:

> The undersigned has reviewed the medical evidence under Sections 1.02, 1.05, 2.02, 2.04, 6.02, 7.02, and 11.14 of the Listing of Impairments in Appendix 1, Subpart P, Regulations Part 404. There are not indicated findings by treating or examining physicians that satisfy the requirements of any listed impairment. Therefore, the undersigned finds the claimant does not have an impairment or combination of impairments that meet or medically equal one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1, and is explained in much further detail in Finding #5 below.

(Tr. 15.)

The ALJ then provided a detailed review of the medical evidence relating to Sutton's joints, diabetes, vision, and feet under Finding #5. (Tr. 16- 21.) This recitation of the evidence is over 5 pages long and includes a thorough discussion of the objective medical evidence, treatment notes and examination findings relating to Sutton's various physical impairments. (*Id.*) Since Sutton's challenge to the ALJ's step-three analysis encompasses Listings 1.02, 1.05, 9,00, and 11.14, the Court will address each Listing in turn.

*a. Listing 1.02*

Substantial evidence supports the ALJ's conclusion Sutton does not meet the requirements of Listing 1.02. Listing 1.02 addresses major dysfunction of the joints, due to any cause. 20 C.F.R. Pt. 404, Subpart P, App. 1, §1.02. This Listing is defined as follows:

> 1.02 *Major dysfunction of a joint(s) (due to any cause)*: Characterized by gross anatomical deformity (e.g., subluxation, contracture, bony or fibrous ankylosis, instability) and chronic joint pain and stiffness with signs of limitation of motion or other abnormal motion of the affected joint(s), and findings on appropriate medically acceptable imaging of joint space

24

narrowing, bony destruction, or ankylosis of the affected joint(s). With:

A. Involvement of one major peripheral weight-bearing joint (i.e., hip, knee, or ankle), resulting in inability to ambulate effectively, as defined in 1.00B2b[.]

20 C.F.R. Pt. 404, Subpt. P, App. 1, §1.02.

The "inability to ambulate effectively" is defined as follows:

Inability to ambulate effectively means an extreme limitation of the ability to walk; i.e., an impairment(s) that interferes very seriously with the individual's ability to independently initiate, sustain, or complete activities. Ineffective ambulation is defined generally as having insufficient lower extremity functioning (see 1.00J) to permit independent ambulation without the use of a hand-held assistive device(s) that limits the functioning of both upper extremities.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00B2(b)(1). The regulations provide further guidance regarding effective ambulation, as follows:

To ambulate effectively, individuals must be capable of sustaining a reasonable walking pace over a sufficient distance to be able to carry out activities of daily living. They must have the ability to travel without companion assistance to and from a place of employment or school. Therefore, examples of ineffective ambulation include, but are not limited to, the inability to walk without the use of a walker, two crutches, or two canes, the inability to walk a block at a reasonable pace on rough or uneven surfaces, the inability to use standard public transportation, the inability to carry out routine ambulatory activities, such as shopping and banking, and the inability to climb a few steps at a reasonable pace with the use of a single hand rail. The ability to walk independently about one's home without the use of assistive devices does not, in and of itself, constitute effective ambulation.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 1.00B2(b)(2).

At step two, the ALJ determined Sutton suffered from the severe impairment of degenerative joint disease of the knees, among other things. (Tr. 14.) The ALJ then determined, at step three, Sutton's impairment did not meet or equal Listing 1.02, as noted *supra*. (Tr. 15.)

The ALJ directed the reader to Finding #5 for further discussion. (*Id.*)

Later in the decision, at Finding #5, the ALJ noted Sutton had moderate degenerative changes in his right knee. (Tr. 18.) She discussed, at length, Sutton's physical therapy for his knee, particularly his action plan to walk five blocks several times a week. (*Id.*) She noted a treatment note from September 2014, indicating no gait issues. (*Id.*) The ALJ acknowledged Sutton used a straight cane for ambulation, but also noted some inconsistencies surrounding when he first used a cane. (Tr. 19.) The ALJ discussed the fact Sutton did not use a walker. (*Id.*) It is clear from this discussion the ALJ properly considered Listing 1.02.

Sutton points to no evidence he must use a hand held assistive device limiting both upper extremities. In his brief, he simply notes he uses a cane for balance control. (Doc. No. 12 at 12.) The record reflects Sutton began to use a straight cane in February 2014, and prior to that, did not use any type of assistive device. (Tr. 705, 681.) He has denied the use of a walker. (Tr. 681.) He did use crutches following his March 2015 amputation, but this was for post-operative recovery. (Tr. 1235, 1270.) By the time of the June 2015 hearing, he was again using a cane. (Tr. 42-43.) Courts have found that use of a single cane or crutch does not establish that a claimant is unable to ambulate effectively for purposes of meeting Listing 1.02. *See Brown v. Colvin,* 2016 WL 1068966 at * 10 (N.D. Ohio Feb. 5, 2016) *report and recommendation adopted,* 2016 WL 1071103 (N.D. Ohio March 17, 2016); *Rainey-Stiggers v. Comm'r of Soc. Sec.*, 2015 WL 729670 at * 6 (S.D. Ohio Feb. 19, 2015) (citing 20 C.F.R. Part 404, Subpart P, App. 1, § 1.00B2b(1)(2)); *Jackson v. Comm'r of Soc. Sec.*, 2009 WL 612343, at *3 (E.D. Mich. Mar.6, 2009). *See also Forrest v. Comm'r of Soc. Sec.*, 591 Fed. App'x 359, 366 (6th Cir. 2014) (finding claimant did not meet requirements of Listing 1.02A where he "used one cane at most,

often went without, and could otherwise ambulate effectively during the relevant period.")

Accordingly, the Court finds Sutton has not satisfied his burden of demonstrating the ALJ erred in finding he did not meet the requirements of Listing 1.02.

### b. Listing 1.05

Substantial evidence also supports the ALJ's conclusion Sutton does not meet the requirements of Listing 1.05. Listing 1.05 provides evaluation of amputations, due to any cause. 20 C.F.R. Pt. 404, Subpt. P, App. 1, §1.05. Relevant to Sutton, this Listing provides as follows:

> 1.05 *Amputation (due to any cause)*:
>
> ...
>
> B. One or both lower extremities at or above the tarsal region, with stump complications resulting in medical inability to use a prosthetic device to ambulate effectively, as defined in 1.00B2b, which have lasted or are expected to last for at least 12 months;
>
> ...

20 C.F.R. Pt. 404, Subpt. P, App. 1, §1.05(B).

At step two, the ALJ determined Sutton suffered from the severe impairment of amputation of the toes of the right foot. (Tr. 14.) The ALJ then determined, at step three, Sutton's impairment did not meet or equal Listing 1.05, as noted *supra*. (Tr. 15.) The ALJ directed the reader to Finding #5 of the discussion. (*Id*.) At Finding #5, the ALJ acknowledged all of Sutton's toes on his right foot had been amputated. (Tr. 16, 19.) The ALJ discussed Sutton's osteomyelitis in the fourth metatarsal, and subsequent amputation of the transmetatarsal in his right foot. (Tr. 19.) The ALJ further noted Sutton was healing well from his March 2015 amputation. (*Id*.) As discussed *supra*, the ALJ also provided a discussion regarding Sutton's use of a cane and, and the fact he did not use a walker. (*Id*.)

Sutton points to no evidence he had any amputations at or above the tarsal region, or any stump complications, as required by Listing 1.05. (Doc. No. 12 at 11.) As noted by the Listing, the tarsal bones are the bones in the hindfoot, 20 CFR Pt. 404, Subpt. P, App. 1, §1.00(F), which does not include toes, or metatarsals. Sutton has openly acknowledged he had his toes removed (Tr. 42), but has never alleged the amputation of any portion of his hind foot. Moreover, the medical record only reveals amputations to his metatarsals, not his tarsal bones. (Tr. 683, 1232.) Courts have found a toe amputation does not qualify as an "amputation at or above the tarsal region" for purposes of Listing 1.05. *See Moore v. Colvin,* 2015 WL 5062251 at *4 (E.D.N.C. Aug. 10, 2015); *Savoie v. Colvin,* 2015 WL 1004217 at *5 (M.D.L.A. Mar. 5, 2015) (finding the "tarsal region" is more commonly referred to as the ankle).

Accordingly, the Court finds Sutton has not satisfied his burden of demonstrating the ALJ erred in finding he did not meet the requirements of Listing 1.05.

### *c. Listing 11.14*

Substantial evidence supports the ALJ's conclusion Sutton does not meet the requirements of Listing 11.14. Listing 11.14 provides the evaluation for peripheral neuropathy. 20 C.F.R. Pt. 404, Subpt. P, App. 1, §11.14. Relevant to Sutton, this Listing provides as follows:

> 11.14 *Peripheral neuropathy*:
>
> A. *Disorganization of motor function* in two extremities (see 11.00D1), resulting in an *extreme limitation* (see 11.00D2) in the ability to stand up from a seated position, balance while standing or walking, or use the upper extremities.
>
> ...

20 C.F.R. Pt. 404, Subpt. P, App. 1, §11.14(A)(emphasis added).

*Disorganization of motor function* is defined as interference with the movement of two

extremities. 20 C.F.R. Pt. 404, Subpt. P, App. 1, §11.00(D)(1). An *extreme limitation* means three possible scenarios: 1) once seated, the claimant is unable to stand and maintain an upright position, without the assistance of another person, or a walker, two crutches, or two canes; 2) the claimant is unable to maintain an upright position while standing or walking without the assistance of another person, or a walker, two crutches, or two canes; or 3) an inability to perform fine and gross motor movements. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, §11.00(D)(2).

At step two, the ALJ determined Sutton suffered from the severe impairment of diabetes mellitus. (Tr. 14.) The ALJ then determined, at step three, Sutton's impairment did not meet or equal Listing 11.14, as noted *supra*. (Tr. 15.) The ALJ directed the reader to Finding #5 of the decision for further discussion. (*Id*.) At Finding #5, the ALJ considered, in detail, the medical evidence relating to his neuropathy. She noted Sutton received a diagnosis of peripheral neuropathy in January 2012 and described the objective findings by Sutton's neurologist, including reduced sensation below the knees, and reduced vibtratory sensation in the toes and fingers. (Tr. 17.) The ALJ also expressly acknowledged Sutton's EMG, which confirmed peripheral neuropathy. (*Id*.)

The ALJ further noted that on examination in September 2014, Sutton had no gait issues but reported some problems with balance. (*Id*.) The ALJ noted Sutton did not begin to use a cane until early 2014. (Tr. 19.) She further discussed the fact Sutton has indicated he has no feeling in his left foot, and numbness in his right. (*Id*.) The ALJ then went on to discuss the fact that Sutton is independent at home, can use public transportation, and had no issues with personal care. (Tr. 19, 20.) She noted Sutton had reported increased activity to his physical therapist in February 2014. (Tr. 19.) The ALJ discussed Sutton's hand complaints, and noted his

paresthesia had improved following his ulnar nerve decompression procedure. (Tr. 14, 15.) It is clear from this discussion the ALJ fully considered Listing 11.14.

Moreover, a review of the foregoing evidence further supports a finding Sutton's condition did not rise to the level contemplated by Listing 11.14. Sutton does not point to any specific evidence which supports a finding there is disorganization of motor function. In his brief, he generally describes Listing 11.14, and simply concludes his neuropathy has "caused significant limitations in his ability to stand or walk." (Doc No. 12 at 13.) He does not cite to any evidence which would establish he has a *disorganization in motor function,* as defined by the regulations. To the contrary, and as noted above, Sutton has not directed this Court's attention to any evidence he used a hand held assistive device that limits *both* upper extremities. Moreover, while he does have neuropathy in his arms, Sutton's fine motor coordination was normal on examination. (Tr. 685, 837.)

Accordingly, the Court finds Sutton has not satisfied his burden of demonstrating the ALJ erred in finding he did not meet the requirements of Listing 11.14.

### *d. Listing 9.00*

Substantial evidence supports the ALJ's conclusion Sutton does not meet the requirements of Listing 9.00. Listing 9.00 is the listing under which endocrine disorders, such as diabetes, are evaluated. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, §9.00. This Listing directs the ALJ to consider the complications that arise from diabetes under the relevant listing. *Id.* For example, Sutton's diabetic retinopathy would be considered under Listing 2.00. Sutton's amputation would be considered under Listing 1.00, and his neuropathies would be considered under 11.00. *Id.*

As the Court has already discussed Listings 11.00 and 1.00, the Court turns to Listing

2.02 and 2.04 to evaluate Sutton's diabetic retinopathy. Listing 2.02 provides:

> *2.02 Loss of Central Visual Acuity.* Remaining vision in the better eye after
> best correction is 20/200 or less.

20 C.F.R. Pt. 404, Subpt. P, App. 1, §2.02.

> Listing 2.04 provides:
>
> 2.04 *Loss of visual efficiency, or visual impairment, in the better eye*:
>
> A. A visual efficiency percentage of 20 or less after best correction (see
> 2.00A7d).
>
> OR
>
> B. A visual impairment value of 1.00 or greater after best correction (see
> 2.00A8d).

20 C.F.R. Pt. 404, Subpt. P, App. 1, §2.04.

At step two, the ALJ determined Sutton suffered from the severe impairments of diabetes

mellitus and visual disturbances with diabetic retinopathy. (Tr. 14.) The ALJ then determined, at

step three, Sutton's impairment did not meet or equal Listing 2.02 and 2.04, as noted *supra*. (Tr.

15.) The ALJ directed the reader to Finding #5 for further discussion. (*Id.*)

Within Finding #5, the ALJ had several paragraphs dedicated to discussing Sutton's

vision. (Tr. 17, 18.) The ALJ noted Sutton had undergone laser surgery on the right eye, and

vitrectomy surgery on the left. (Tr. 17.) The ALJ discussed the March 28, 2012 ophthalmology

examination, where Sutton had a best corrected vision of 20/40 in the right eye, and 20/300 in

the left eye. (*Id.*) She further went on to discuss a September 2012 office visit, where Sutton's

visual acuity was measured, with a best corrected vision of 20/300 in the right eye and 20/50 in

the left. (*Id.*)

The ALJ also evaluated the August 8, 2013 consultative examination with Dr. Terman. (*Id*.)  This examination revealed a best-corrected visual acuity of 20/100 in the right eye and 20/50 in the left, as well as abnormal visual fields. (*Id*.)  The ALJ then noted two more ophthalmology examinations, one which revealed a best corrected vision of 20/200 in the right and 20/80 in the left, and another indicating 20/100 in the right, and 20/60 in the left. (Tr. 18.) These numbers are all above Listing 2.02 level. *See* 20 C.F.R. Pt. 404, Subpt. P, App. 1, §2.00(A)(7).

As for Listing 2.04, the ALJ noted Sutton had his visual field measured, and it was abnormal. (Tr. 17.)  A review of the record indicates the examiner, Dr. Terman, did find Sutton's visual fields abnormal, but did not provide a visual field efficiency percentage or the measurements needed to calculate this percentage. (Tr. 596.)  *See* 20 C.F.R. Pt. 404, Subpart P, Appendix 1, §2.00(A)(7)(c). Regardless, it is clear the ALJ considered these visual listings when formulating the decision.

Moreover, Sutton does not point to any specific evidence supporting a finding he meets a visual Listing. In his brief, he generally mentions his diabetic retinopathy should be considered under Listing 2.00, however, he does not provide any meaningful discussion or argument regarding this Listing. (Doc No. 12 at 10.)  As noted *supra*, it is the Sutton's burden to show his impairments meet a listed impairment. *See e.g. Lett*, 2015 WL 853425 at * 15. The ALJ's articulation of Sutton's vision in the body of the decision is sufficient for purposes of the Step 3 analysis.

Sutton has also argued the ALJ failed to consider whether the combination of his impairments would "meet or equal" any listing. (Doc. No. 12 at 14.)  The ALJ expressly stated in

the decision that she considered the combined effects of all the Sutton's impairments, noting Sutton "does not have an impairment or combination of impairments that meet or medically equal one of the listed impairments." (Tr. 15.) This statement, combined with the ALJ's detailed discussion of the medical record, demonstrates the ALJ fulfilled her obligation to consider Sutton's impairments in combination. No further discussion is required by the ALJ. *See Endres v. Comm'r of Soc. Sec.*, 2016 WL 1260739 at *3.

Finally, although the ALJ did not discuss specific medical evidence in the Step Three discussion, the ALJ's decision as a whole, including her RFC analysis, provides sufficient information and analysis to allow this Court to conduct a meaningful judicial review and to conclude the ALJ's Step Three findings are supported by substantial evidence. *See Rainey-Stiggers,* 2015 WL 729670 at * 7 (citing *Forrest v. Comm'r of Soc. Sec.*, —— F. App'x ——, 2014 WL 6185309, at *6 (Nov. 17, 2014) (and cases cited therein). *See also Kern v. Comm'r of Soc. Sec.*, 2017 WL 1324609 at * 2 (S.D. Ohio April 11, 2017) ("The Commissioner's decision may be upheld where the ALJ made sufficient factual findings elsewhere in his decision to support the conclusion at step three.").

Accordingly, and for all the reasons set forth above, the Court finds Sutton has not satisfied his burden of demonstrating the ALJ erred in finding he did not meet the requirements of Listings 1.02, 1.05, 9,00, and 11.14. Sutton's first assignment of error is without merit.

**B.     Residual Functional Capacity**

In his second assignment of error, Sutton argues the ALJ erred in finding he was capable of work at the light exertional level. (Doc. No. 12 at 15.) He raises a number of discrete legal issues in this assignment of error. First, Sutton posits the ALJ did not properly evaluate either his

need for a cane or his upper extremity limitations. (*Id*.)  Next, Sutton argues the ALJ did not

properly consider the opinion of his treating physician, Dr. Winkelman. (*Id*.)  Sutton then

submits the ALJ "failed to perform an acceptable credibility evaluation."  (*Id*.)  Since Sutton

raises a host of arguments regarding the formulation of the residual functional capacity, the

Court will address each of these arguments in turn below.

### *a. Use of an cane to ambulate*

Sutton argues the ALJ's RFC assessment is not supported by substantial evidence

because it failed to include appropriate limitations related to his use of a cane. He  maintains "it

is well settled by the evidence that Plaintiff requires a cane to ambulate," and argues the RFC is

flawed as the ALJ did not articulate any cane limitations. (Doc. No. 12 at 15.)  Sutton further

argues reliance on vocational expert testimony that light jobs exist for individuals that require a

cane is faulty, as "it is widely recognized that the need for a cane to ambulate significantly

erodes the light occupational base."  (*Id*. at 16.)

The Commissioner argues Sutton was not given a cane until 2014, and Sutton's

interpretation of the evidence is "not the only reasonable one."  (Doc. No. 13 at 22, 23.)  She

notes, that,  even if the ALJ erred in failing to assess a cane limitation, "remand is not required,

as the vocational expert identified jobs existing in significant numbers in the national economy

that could be performed even if Plaintiff were further limited to only two hours of walking and to

using a cane for ambulation and balance."  (*Id*. at 23.)

A claimant's RFC is the most he can still do despite his functional limitations. 20 C.F.R.

§404.154(a); SSR 96-8p,1996 WL 374184, at *1 (July 2, 1996). A claimant's RFC is not a

medical opinion, but an administrative determination reserved to the Commissioner. *See* 20

C.F.R.§ 416.927(d)(2). An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner." 20 C.F.R.§ 416.927(d)(3). As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all of the relevant evidence. 20 C.F.R. § 416.946(c). The ALJ must consider all of a claimant's medically determinable impairments, both individually and in combination. SSR 96-8p, at *5.

"In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis." *Fleischer v. Astrue*, 774 F.Supp.2d 875, 880 (N.D. Ohio 2011) (citing *Bryan v. Comm'r of Soc. Sec.*, 383 Fed.App'x. 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")). *See also* SSR 96–8p, at *7 ("The RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted."). While the RFC is for the ALJ to determine, it is well established that the claimant bears the burden of establishing the impairments that determine his RFC. *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).

Here, the ALJ determined Sutton had the following residual functional capacity:

After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except he can never climb ladders, ropes, and scaffolds. He can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl. He has the ability to read ordinary print but not some fine print. He can navigate the hazards of the ordinary workplace. He needs to avoid all exposure to hazards (defined as industrial machinery, unprotected heights, commercial, and driving, etc.).

(Tr. 15.)

The Court rejects Sutton's argument that the above RFC, by failing to provide a limitation for a cane, is not consistent with the weight of the evidence. While Sutton testified he had ambulated with a cane since 2012 (Tr. 42), the medical evidence of record does not support this statement. A review of the record indicates Sutton specifically denied the use of a cane or walker during a physical examination in January 2014. (Tr. 681.) Moreover, Sutton does not direct this Court's attention to evidence demonstrating he used a cane prior to 2014. As Sutton's alleged onset date was on July 13, 2012, for the bulk of the relevant period, Sutton has failed to demonstrate he required an assistive device to ambulate.

As noted above, Sutton began physical therapy in February 2014, at which time his physical therapist issued him a straight cane for balance. (Tr. 705.) Sutton did have improved balance and steadiness with this cane, and continued to use this cane for ambulation in May 2015. (Tr. 724, 1353.) The ALJ considered and discussed Sutton's use of a cane at length in the decision. (Tr. 19.) While there is evidence Sutton used a cane for a portion of the relevant period, the evidence also indicates he did not require a cane for a significant portion of it as well. The Court finds the ALJ's interpretation of the evidence was a reasonable one, and does not provide grounds for reversal.

Moreover, assuming *arguendo* the ALJ had erred in failing to accommodate Sutton's need for a cane, such failure constitutes harmless error. At the hearing, the ALJ asked the VE whether the additional limitation of requiring a cane for ambulation would change his testimony. (Tr. 58.) The VE responded that, with this additional limitation, the hypothetical individual would not be able to perform the occupation of paint spray inspector, but would be able to

perform other jobs such as 1) assembler of electrical accessories (D.O.T. #729.687-010), 2) assembler of small products (D.O.T. #739.687-030), and 3) electronics worker (D.O.T. #726.687-010). (Tr. 58.)  Thus, even if the ALJ did add the limitation of a cane to Sutton's residual functional capacity, the result would essentially be the same. Indeed, the VE expressly noted these jobs are performed at a stationary workstation, where no essential functions were performed while ambulating, so a cane would not be an issue. (Tr. 58.)

Sutton argues the ALJ erred in relying on the VE's testimony, as "it is widely recognized that the need for a cane to ambulate significantly erodes the light occupational base."  (Doc. No. 12 at 16.)  Sutton cites no authority for this assertion. Moreover, the VE addressed why the use of a cane would be irrelevant in respect to these specific jobs. (Tr. 58.)  A VE's testimony in response to a hypothetical posited by the ALJ "can provide substantial evidence to meet the Commissioner's burden at the fifth step of the sequential evaluation process."  *Lee v. Comm'r of Soc. Sec.,* 529 Fed. App'x  706, 715 (6th Cir. 2013).

Accordingly, Sutton has failed to demonstrate the ALJ erred in failing to include in the RFC a limitation of using a cane while ambulating.

### *b. Upper extremity limitations*

Sutton next argues the "ALJ erred in failing to evaluate Plaintiff's upper extremity limitations, particularly his ability to handle and finger."  (Doc. No 12 at 17.)  He notes the medical record indicates he suffers from severe sensory neuropathy in his hands, which is confirmed by both EMG and physical examination. (*Id.*)  Sutton argues the failure to articulate any upper extremity limits is "contrary to the ALJ's duty to consider all of the plaintiff's limitations" in the residual functional capacity. (Doc. No. 12 at 17.)

The Commissioner argues the ALJ's interpretation of the evidence is reasonable, and the decision properly explained why Sutton's "hand impairment did not significantly limit his ability to perform basic work activities." (Doc. No. 13 at 22, 23.) The Commissioner notes Sutton underwent elbow surgery, and reported improvement in his symptoms afterwards. (*Id*. at 21.) The Commissioner also cites portions of the medical record where Sutton indicated his hands were "ok" and the pain was intermittent in nature. (*Id*. at14.)

Here, the ALJ determined Sutton suffered from a number of severe impairments. (Tr. 14.) The ALJ also specifically found Sutton had a nonsevere impairment of "bilateral hands." (*Id*.) The ALJ acknowledged Sutton's testimony that he occasionally had pain and numbness in his hands and difficulty holding small items. (*Id*.) The ALJ then briefly discussed an October 2013 treatment note with Sutton's neurologist, Dr. Winkelman, which included a finding of sensation deficits in the fingers. (Tr. 14, 15.) The ALJ noted Sutton's November 2013 EMG, which confirmed peripheral neuropathy, and his March 2014 EMG which "showed no clear-cut evidence of superimposed right cervical radiculopathy." (Tr. 15.) Finally, the ALJ noted Sutton had undergone a left ulnar nerve decompression in September 2014, and had done well postoperatively. (Tr. 15.)

The Court finds the ALJ's failure to include any limitations to account for Sutton's upper extremity issues is not supported by the substantial weight of the evidence[6]. A review of the record indicates Sutton's hand issues were well-documented. Sutton initially visited with Dr.

---

[6]     Sutton has not argued the ALJ erred in determining his hand impairment to be non-severe at step two. Thus, the Court will not address this issue and will confine its review to the lack of upper extremity limitations in the residual functional capacity.

Winkelman, an neurologist, on October 10, 2013. (Tr. 674.)  While Sutton indicated his hands were "ok", Dr. Winkelman noted he had reduced sensation in his fingers. (Tr. 677.)  A November 2013 EMG of the right leg and right arm confirmed peripheral sensorimotor polyneuropathy, which was severe in nature. (Tr. 664.)  The EMG also indicated right S1 and S2 radiculopathy. (*Id*.)  Sutton returned to Dr. Winkelman's office on November 19, 2013, reporting for the past two weeks, he had been having numbness and tingling in his 4th and 5th fingers of each hand. (Tr. 650.)  Dr. Winkelman found he had severe polyneuropathy, likely due to his diabetes. (Tr. 628.)

Sutton again reported numbness and tingling in the last two fingers of each hand in January 2014. (Tr. 681.)  On examination, he had negative Tinel's signs at the wrists and elbows, but reduced vibratory sensation in his fingers. (Tr. 685.)  In February 2014, Sutton again reported numbness in his fingers. (Tr. 691.)  He had negative Tinel's signs, but 4/5 strength in his upper extremities. (Tr. 693.)  Dr. Winkelman noted reduced sensation in Sutton's 4th and 5th fingers of each hand, and felt the findings indicated not only polyneuropathy, but also bilateral ulnar mononeuropathy. (Tr. 693.)

Sutton then underwent an EMG of his right arm on March 7, 2014, which confirmed peripheral sensorimotor polyneuropathy and possible mild cervical radiculopathy. (Tr. 807.)  A May 2014 EMG of his left arm revealed left ulnar mononeuropathy, and superimposed peripheral neuropathy. (Tr. 899.)  Sutton reported continued numbness, as well as intermittent sharp pains, in both hands. (Tr. 832, 858.)  He had 4/5 strength in his fingers. (Tr. 966.)

In September 2014, Sutton underwent a left ulnar nerve decompression. (Tr. 1069.)  As noted by the ALJ, Sutton reported he was doing well and improving following this procedure.

(*Id*.)  However, when he returned to Dr. Winkelman in May 2015, he relayed he was still having the same symptoms in his left arm and right arm. (Tr. 1352.)  On examination, Sutton had reduced sensation in the 4th and 5th fingers of each hand. (Tr. 1353.)  Dr. Winkelman referred him to an orthopedist for a possible right ulnar nerve procedure. (Tr. 1354.)

In light of Sutton's three positive EMG results, ulnar operation, and the possibility of another procedure, the Court finds the RFC articulated by the ALJ, in its failure to consider Sutton's hand impairments, is not supported by substantial evidence. As discussed in detail above, Sutton had positive EMG findings in November 2013, March 2014, and May 2014, documenting peripheral neuropathy in both upper extremities. (Tr. 664, 807, 899.)  His doctor repeatedly noted decreased sensation in four of his fingers. (Tr. 677, 685, 693, 837, 1353.)  While Sutton did undergo an ulnar nerve decompression in September 2014, and reported good results, this procedure did not correct his polyneuropathy in both hands, only his ulnar nerve issue on the left. (Tr. 1069.)  In fact, at his most recent appointment with his doctor, Sutton still had decreased sensation in both hands, and possibly needed an ulnar decompression on the right. (Tr. 1353, 1354.)

In the decision, the ALJ notes two of the three EMGs. (Tr. 15.)  The ALJ goes on to discuss how Sutton was "doing well and his paresthesia was improving" following his September 2014 *left* ulnar nerve procedure. (*Id*.)  However, the decision offers no discussion as to Sutton's *right* arm symptoms, which did not undergo any corrective procedure. The failure to reflect Sutton's upper extremity impairments in the residual functional capacity, in the face of all this objective evidence and testing, is unreasonable, particularly in light of the VE's testimony that no jobs would be available with an additional restriction of occasional fingering, handling,

and feeling bilaterally. (Tr. 60.)  Thus, the Court finds remand is necessary, thereby affording the ALJ an opportunity to consider Sutton's upper extremity limitations when formulating the residual functional capacity.

### c. Opinion of Dr. Winkelman

Sutton argues the ALJ erred in failing to properly evaluate the opinion of his treating physician, Dr. Winkelman. (Doc. No. 12 at 17.)  He notes Dr. Winkelman submitted a opinion outlining Sutton's limitations, and found he was significantly limited. (Doc. No. 12 at 18.) Sutton asserts the ALJ "wholly rejects this opinion," and such rejection is "unsupported by substantial evidence."  (*Id*.)

The Commissioner argues it is up to the ALJ to "determine the weight each opinion is due." (Doc. No. 13 at 19.)  The Commissioner acknowledges the ALJ assigned more weight to the state agency medical consultant, but argues the ALJ is not precluded from doing so. (*Id*.) The Commissioner notes a treating source opinion is only entitled to controlling weight if it is "well supported by clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence of record."  (*Id*. at 20.)  The Commissioner argues since the ALJ provided several good reasons for discounting this opinion, this was well within the ALJ's discretion. (*Id*. at 21.)

The Sixth Circuit has provided specific guidelines in evaluating the opinion of a treating physician. A treating source opinion must be given "controlling weight" if such opinion (1) "is well supported by medically acceptable clinical and laboratory diagnostic techniques" and (2) "is not inconsistent with the other substantial evidence in [the] case record."  *Gayheart v. Comm'r of*

*Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013); 20 C.F.R. §404.1527(c)(2)[7]. However, "a finding

that a treating source medical opinion. . . is inconsistent with the other substantial evidence in the

case record means only that the opinion is not entitled to 'controlling weight,' not that the

opinion should be rejected." *Blakley v. Comm'r of Soc. Sec.,* 581 F.3d 399, 408 (6th Cir. 2009)

(quoting Soc. Sec. Rul. 96-2p[8], 1996 WL 374188 at *4). Indeed, "[t]reating source medical

opinions are still entitled to deference and must be weighed using all of the factor provided in 20

C.F.R. §404.1527 and 416.927." *Blakley,* 581 F.3d at 408.[9] *See also Gayheart*, 710 F.3d at 376

("If the Commissioner does not give a treating-source opinion controlling weight, then the

opinion is weighed based on the length, frequency, nature, and extent of the treatment

relationship, *id.,* as well as the treating source's area of specialty and the degree to which the

opinion is consistent with the record as a whole and is supported by relevant evidence, *id*. §

404.1527(c)(2)-(6).")

   If the ALJ determines a treating source opinion is not entitled to controlling weight, "the

ALJ must provide 'good reasons' for discounting [the opinion], reasons that are 'sufficiently

---

[7]   Revised versions of these regulations took effect on March 27, 2017 and apply to disability claims filed on or after that date. *See* 82 Fed. Reg. 5844 (March 27, 2017).

[8]   SSR 96-2p has been rescinded. This recession is effective for claims filed on or after March 27, 2017. SSR 96-2p, 2017 WL 3928298 at *1.

[9]   Pursuant to 20 C.F.R. §404.1527(c)(2), when not assigning controlling weight to a treating physician's opinion, the Commissioner should consider the length of the relationship and frequency of examination, the nature and extent of the treatment relationship, how well-supported the opinion is by medical signs and laboratory findings, its consistency with the record as a whole, the treating source's specialization, the source's familiarity with the Social Security program and understanding of its evidentiary requirements, and the extent to which the source is familiar with other information in the case record relevant to the decision.

specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007) (quoting Soc. Sec. Ruling 96-2p[10], 1996 WL 374188 at *4). *See also Gayheart*, 710 F.3d at 376. The purpose of this requirement is two-fold. First, a sufficiently clear explanation "'let[s] claimants understand the disposition of their cases,' particularly where a claimant knows that his physician has deemed him disabled and therefore 'might be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'" *Id.* (quoting *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)). Second, the explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Wilson*, 378 F.3d at 544. Because of the significance of this requirement, the Sixth Circuit has held that the failure to articulate "good reasons" for discounting a treating physician's opinion "denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.[11]

Nevertheless, the opinion of a treating physician must be based on sufficient medical data, and upon detailed clinical and diagnostic test evidence. *See Harris v. Heckler*, 756 F.2d

---

[10]     SSR 96-2p has been rescinded. This recession is effective for claims filed on or after March 27, 2017. SSR 96-2p, 2017 WL 3928298 at *1.

[11]     "On the other hand, opinions from nontreating and nonexamining sources are never assessed for 'controlling weight.' The Commissioner instead weighs these opinions based on the examining relationship (or lack thereof), specialization, consistency, and supportability, but only if a treating-source opinion is not deemed controlling. 20 C.F.R. § 404.1527(c). Other factors 'which tend to support or contradict the opinion' may be considered in assessing any type of medical opinion. *Id.* § 404.1527(c)(6)." *Gayheart*, 710 F.3d at 376.

431, 435 (6th Cir. 1985); *Bogle v. Sullivan*, 998 F.2d 342, 347-48 (6th Cir. 1993); *Blakley*, 581

F.3d at 406. The ALJ is not bound by conclusory statements of a treating physician that a

claimant is disabled, but may reject such determinations when good reasons are identified for not

accepting them. *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984); *Duncan v. Secretary of*

*Health & Human Servs.*, 801 F.2d 847, 855 (6th Cir. 1986); *Garner v. Heckler*, 745 F.2d 383,

391 (6th Cir. 1984). According to 20 C.F.R. § 404.1527(d)(1), the Social Security Commissioner

makes the determination whether a claimant meets the statutory definition of disability. This

necessarily includes a review of all the medical findings and other evidence that support a

medical source's statement that one is disabled. "A statement by a medical source that you are

'disabled' or 'unable to work' does not mean that we will determine that you are disabled." *Id*. It

is the Commissioner who must make the final decision on the ultimate issue of disability.

*Duncan*, 801 F.2d at 855; *Harris*, 756 F.2d at 435; *Watkins v. Schweiker*, 667 F.2d 954, 958

(11th Cir. 1982).

     Here, the ALJ thoroughly recounted and analyzed the medical evidence regarding

Sutton's diabetes and related complications, including his toe amputations and recurrent ulcers.

(Tr. 16-19.)  The ALJ then went on to discuss the opinion of Dr. Winkelman, as follows:

> The undersigned has considered the Medical Source Statement – Physical by
> Marc Winkelman, M.D., dated May 9, 2014 (Ex. 22F). He noted the
> claimant could stand and walk less than two hours (five minutes at a time) in
> an eight-hour workday. He could sit for about four hours (15 minutes at a
> time). He needed to shift positions and alternate sitting and standing. He
> needed additional unscheduled breaks of two or three daily. He needed to
> rest for 20-30 minutes before returning to work. The claimant needed to use
> a cane for imbalance and weakness. He could rarely lift and carry less than
> 10 pounds, twist, and climb ladders and stairs. He could never stoop and
> crouch. The claimant was significantly limited in reaching, handling, and
> fingering. The claimant's hands were weak and numb and he lacked
> dexterity and strength. He would be off-task 25 percent or more during an

eight-hour workday. He was capable of moderate stress. He would be absent from work more than four days per month because of his impairments and treatment. The evidence shows that Dr. Winkelman first saw the claimant in the fall of 2013, and he only saw the claimant a few months before assessment (Ex. 18F). The symptoms described are more severe than the record reflects. He reported extremely limited capacities, but the claimant has had ulnar surgery with improvement. His assessment was before fitting with diabetic shoe and physical therapy for walking without a device (Ex. 22F).

(Tr. 20, 21).

The Court finds the ALJ failed to properly evaluate Dr. Winkelman's opinion[12]. As noted above, the ALJ must provide "good reasons" for the weight assigned, and articulate these reasons in order to allow for meaningful appellate review. Here, the ALJ did not comply with these requirements. The ALJ provided the conclusory statement that "the symptoms described are more severe than the record reflects. (Tr. 21.) However, while the ALJ did discuss the treatment history between Dr. Winkelman and Sutton, she did not connect this treatment with any of the specific limitations offered by Dr. Winkelman. (*Id*.) Further, the ALJ did not point to any specific evidence that indicated Sutton's symptoms were more severe than reflected in the record. This is problematic.

---

[12]     While the ALJ noted she "considered" the opinion, she did not assign it any specific weight. (Tr. 20.) The Commissioner argues it is within the ALJ's discretion to assign the state agency medical consultant's opinion more weight than a treating physician. (Doc. No. 13 at 20.)  While this is true, it is not clear this is what the ALJ actually did. The ALJ simply notes the "symptoms described are more severe than [the] record reflects" and that the opinion of Dr. Winkelman was "considered." (Tr. 21.) The Court can extrapolate from the negative treatment and discussion following this opinion that the ALJ did not give it controlling, or even great weight. Indeed, by failing to include the majority of the functional limitations assessed by Dr. Winkelman in the RFC, the Court agrees with Sutton that the ALJ rejected this opinion.

As noted *supra*, Dr. Winkelman offered significant limits Sutton's abilities to reach, handle, and finger with the bilateral hands. (Tr. 885.)  He also noted Sutton's "hands are weak and numb and for those reasons they lack dexterity and strength."  (Tr. 885). In the decision, the ALJ simply noted Sutton had undergone *left* ulnar surgery, with improvement. (Tr. 21.)  As discussed above, however, this fails to account for Sutton's *right* hand limitations, which were confirmed by EMG. (Tr. 807.)  In the ALJ's discussion of the opinion, she does not address why she is not adopting the *right* hand findings made by Dr. Winkelman, the treating physician who had examined Sutton's hands on multiple occasions[13].

The ALJ also further discounted the opinion, on the grounds it was rendered "before fitting with diabetic shoe[s] and physical therapy for walking without a device."  (Tr. 21.)  Both of these reasons are inconsistent with the medical evidence of record. It is unclear what "physical therapy for walking without a device" entails, as the record indicates Sutton has been consistently using a cane since Dr. Winkelman's opinion was rendered. (Tr. 832, 966, 1015, 1353.)  Moreover, while Sutton began to wear diabetic shoes since Dr. Winkelman offered his opinion, the record reflects he also has lost several more toes (Tr. 959, 1041, 1227), calling into question the ALJ's suggestion he has improved since being fitted for diabetic shoes.

Accordingly, the Court finds the ALJ erred in her treatment of Dr. Winkelman's opinion. While there may be good reasons to reject portions of this opinion, the ALJ failed to sufficiently articulate those reasons in order to allow for meaningful appellate review. Thus, the decision should be vacated and this matter further remanded for further consideration of Dr. Winkelman's

---

[13]    The record does reflect Sutton continued to experience right hand symptoms. (Tr. 1352, 1353, 1354.)

opinion.

### d. Credibility evaluation

In his final argument, Sutton asserts the "ALJ failed to consider his subjective complaints as they relate to the evidence of record, or perform an acceptable analysis of his credibility," citing to Social Security Ruling 16-3p. (Doc. No. 12 at 19, 20.) Sutton notes the ALJ failed "to provide any meaningful analysis of the Plaintiff's subjective complaints" and the decision was "completely void of any acknowledgment of the Plaintiff's symptoms." (*Id*. at 20.)

The Commissioner argues the ALJ properly examined the evidence and found Sutton's subjective complaints were inconsistent with the record as a whole. (Doc. No. 13 at 17.) The Commissioner asserts the ALJ considered the objective medical evidence, Sutton's reported daily activities, his testimony, and his course of treatment. (*Id.* at 17, 18.)

To determine credibility, the ALJ must look to medical evidence, statements by the claimant, other information provided by medical sources, and any other relevant evidence on the record. *See* 20 C.F.R. §404.1529; SSR 96–7p[14], Purpose, 1996 WL 374186 (July 2, 1996).

---

[14] SSR 16-3p supercedes SSR 96-7p, 1996 WL 374186 (July 2, 1996), which was in effect at the time of the June 10, 2015 hearing. Sutton suggests that SSR 16-3p governs this case, while the Commissioner has argued that applying SSR 16-3p over SSR 96-7p would not change the outcome. This Court has previously decided, in dicta, to apply SSR 16-3p retroactively. *See e.g., Anderson v. Berryhill*, 2017 WL 1326437 at fn 3 (N.D. Ohio March 2, 2017). Here, although the issue is raised, the parties do not fully address SSR 16-3p's application. District courts within this Circuit have disagreed regarding the retroactivity of SSR 16-3p and the Sixth Circuit has not decided the issue. *See Sypolt v. Berryhill*, 2017 WL 1169706 at fn 4 (N.D. Ohio March 8, 2017) *(*applying SSR 16-3p retroactively); *Clayton v. Comm'r of Soc. Sec*., 2016 WL 5402963 at * 6 (E.D. Mich. Sept. 28, 2016) (applying SSR 16-3p but not directly addressing issue of retroactivity); *Carpenter v. Comm'r of Soc. Sec*., 2017 WL 1038913 at * 11 (N.D. Ohio March 17, 2017) (applying SSR 16-3p but not directly addressing issue of retroactivity). *But see Murphy v. Comm'r of Soc. Sec*., 2016 WL 2901746, at n.6(E.D. Tenn. May 18, 2016) (declining to apply SSR 16-3p retroactively); *Withrow v. Comm'r of Soc. Sec*., 2016 WL

Beyond medical evidence, there are seven factors that the ALJ should consider[15]. The ALJ need not analyze all seven factors, but should show that he considered the relevant evidence. *See Cross*, 373 F. Supp.2d at 733; *Masch v. Barnhart*, 406 F. Supp.2d 1038, 1046 (E.D. Wis. 2005).

Here, the ALJ found while Sutton's medically determinable impairments could reasonably be expected to cause the alleged symptoms, his statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely credible. (Tr. 16.) In support of this conclusion, the ALJ provided a detailed overview of the objective medical evidence. (Tr. 17, 18.) The ALJ also discussed Sutton's testimony regarding his ability to stand

---

4361175 at fn 5 (S.D. Ohio Aug. 16, 2016) (same); *Richards v. Comm'r of Soc. Sec.*, 2017 WL 892345 at fn 5 (E.D. Mich. Feb. 16, 2017); *Davis v. Astrue*, 2016 WL 5957616 at fn 2 (W.D. Tenn. Oct. 14, 2016) (same); *Baker v. Comm'r of Soc. Sec.*, 2016 WL 4361174 at fn 2 (S.D. Ohio Aug. 16, 2016); *Scott v. Berryhill*, 2017 WL 875480 at fn 7 (E.D. Ky. March 3, 2017). The Sixth Circuit, while declining to reach the retroactivity issue, has characterized SSR 16-3p as merely eliminating "the use of the word 'credibility' ... to 'clarify that subjective symptom evaluation is not an examination of an individual's character.' " *Dooley v. Comm'r of Soc. Sec.*, 656 Fed. Appx. 113, 119 n.1 (6th Cir. 2016). The Court perceives the issue to be largely academic here; Sutton makes no argument that applying SSR 16-3p over SSR 96-7p would change the outcome. As discussed above, the ALJ evaluated Sutton's complaints against the objective medical evidence and did not judge Suttons character. In any event, the Court's evaluation of Sutton's credibility argument herein would be the same applying either SSR 16-3p or SSR 96-7p.

[15] The seven factors are: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. *See* SSR 96–7p, Introduction and SSR 16-3p, 2016 WL 1119029 at * 7; *see also Cross v. Comm'r of Soc. Sec.*, 373 F.Supp.2d 724, 732–733 (N.D. Ohio 2005) (stating that an ALJ, in a unified statement, should explain his or her credibility findings in terms of the factors set forth in the regulations, thereby permitting the court to "trace the path of the ALJ's reasoning.")

and his foot neuropathy. (Tr. 19.) Finally, the ALJ considered that Sutton could perform some daily activities, noting both the evidence in his medical treatment notes, as well as his testimony. (Tr. 19, 20.)

The Court finds the ALJ properly analyzed Sutton's credibility. In the decision, the ALJ fully considered the medical evidence and hearing testimony, noting the conflicts between Sutton's testimony and the record of when he began to use a cane. (Tr. 19.) The ALJ noted Sutton was able to prepare light meals, had no issue with personal care and using public transportation, but depended upon family members for grocery shopping and cleaning. (Tr. 20.) In sum, the ALJ recognized the objective medical evidence confirms Sutton has some degree of standing and walking limits as a result of his impairments, but properly found his limitations were not as severe as alleged. Reading the decision as a whole, the Court therefore finds the ALJ properly analyzed Sutton's credibility.

## VII. CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the Commissioner's final decision be VACATED and the case REMANDED for further proceedings consistent with this decision.

*s/Jonathan D. Greenberg*
Jonathan D. Greenberg
United States Magistrate Judge

Date: December 8, 2017

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation. 28 U.S.C. § 636(b)(1). Failure to file objections within**

the specified time may waive the right to appeal the District Court's order. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).